# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

MICHAEL JAMES WINTERS,

        Plaintiff,

vs.

DEERE & COMPANY,

        Defendant.

No. C20-2082-LTS

**MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

This case is before me on a motion (Doc. 20) for summary judgment by defendant Deere & Company (Deere).  Plaintiff Michael Winters has filed a resistance (Doc. 22) and Deere has filed a reply (Doc. 24).  Deere has requested oral argument, but I find it to be unnecessary.  *See* Local Rule 7(c).

## II.  PROCEDURAL HISTORY

Winters commenced this action on September 18, 2020, by filing a petition (Doc. 4) in the Iowa District Court for Black Hawk County.  He asserts the following claims under the Iowa Civil Rights Act (ICRA): (1) age discrimination, (2) harassment, (3) retaliation, (4) failure to accommodate and (5) disability discrimination.  Doc. 4.[1]  On October 12, 2020, Deere filed a notice (Doc. 1) of removal to this court, invoking the court's diversity of citizenship jurisdiction.  Trial is scheduled to begin January 10, 2022.

---

[1] Winters previously filed an administrative complaint with the Iowa Civil Rights Commission (ICRC) and obtained a right-to-sue letter.  Doc. 4 at 2, 4.

### III.  SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, "the substantive law will identify which facts are material." *Id.*  Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).  Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49.  The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323).  Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there

2

is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

No unique summary judgment standards apply to employment discrimination cases. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042-43 (8th Cir. 2011) (en banc) (rejecting prior decisions that applied a "discrimination case exception" to the analysis of summary judgment motions). Thus, "the focus of inquiry at the summary judgment stage 'always remains on the ultimate question of law: whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the plaintiff because of [the protected characteristic].'" *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1018 (8th Cir. 2005) (quoting *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1336-37 (8th Cir. 1996)).

## IV. RELEVANT FACTS

### A. Winters' Employment Background

Deere operates a manufacturing facility known as John Deere Waterloo Works in Waterloo, Iowa. Doc. 22-3 at 1. Winters began his employment on May 1, 1989. *Id.* For at least two decades, he worked as an hourly production employee in a bargaining unit position. *Id.* For the last seven years of his employment, Winters worked as a salaried, non-union robotic controls engineer. *Id.* at 2.

Starting in 2013, Jared Morrison, the manufacturing engineering supervisor for robotic innovation, supervised Winters. *Id.* From 2013 to 2018, Morrison conducted Winters' annual performance reviews. *Id.* at 3. Those reviews included the following comments (all from Morrison, unless otherwise noted):

> 2013: You have done a good job working with the students to develop themselves, keep it up. The students will reflect on these projects the rest of their working life. You need to make sure that we are treating our contract and contingent employees just like they are JD employees, in regards to the work that they do. They need to be a part of all project conversations that they are involved in. I've noticed a little seperation [sic] there, just work on those relationships in the future. Doc. 20-3 at 69.

> 2013: You have done a good job with getting drawings done, helping others with their drawings, and getting parts here on time. I'd like to see you use the schedule at a glance a little more to manage the upcoming project deadlines. I'll do my best to make sure that it is updated as soon as I get the new info. . . . There was a lot of good work done since mid year, however there was quite a bit of work rescheduled to FY14 along with what was already planned to be done. Please make sure that we continue to stay on top of all of it. Doc. 20-6 at 59.

> 2013: You may not know it but you do impact PDP execution for FT4. . . . You have made some very good in ground in the ability to switch gears, hand and issue and then go back to the work that you were interupted [sic] in doing. I've seen really good progress there. *Id.*

> 2013: As a controls engineer you need frequent contact with suppliers. You also get to have some not so pleasant conversations with them. I think you

4

do a good job interfacing to most of our suppliers. *Id*. at 63.

There have been a lot of opportunities for OT this last year, I need you to know that the business has been successful due in part to the time that you have put in. *Id*. at 67.

The improvements in inventory control have been wonderful. I think there is some room for improvement yet, but overall it has been very successful. *Id*. at 68.

I have been very impressed on how you have developed yourself to be a much better multitasker than you were 6 months ago. This is very important in the group that you are in. We rarely get to start a project and only focus on it until it's done . . . . Job well done!!! *Id*.

I need to impress heavily on you the importance of treating everyone in the group fairly and equally. You will see a huge jump in respect for you from others in the group if you work on this. *Id*.

2014: Sometimes the electricians can be a bit difficult to work with. You do a good job of maintaining focus and driving to the best result. Keep that drive alive, even though it is very difficult at times. . . The electricians continue to be challenging to work with. Keep working with them to get your projects installed/debugged. I don't expect FY15 to be any better in this arena. I've noticed some comments between you to other folks in the group can get a little raw. I'll caution you on this. If someone decides to take offense to those comments, there really isn't anything that you can do. You are giving them all the ammunitionthey [sic] need to have a conversation with HR." Doc. 20-4 at 1.

2014: As a result of our end of year conversations I've observed you working on your relationships with our contract and contingent folks. Continue to strengthen those relationships. You also need to remember to include them in conversations around new ways ofdoing [sic] things, ie: multiple hold buttons, remote reset/cycle start, etc. I'll reiterate the [sic] comment that I made previously. Some of the comments that you make can be construe [sic] as disrespectful. Just be aware that a bystander that is not part of the conversation could view such comments differently than they were intended to be delivered. *Id*. at 2.

2015: I agree that you have made great strides these last six months in both

5

business and people skills. We've had a couple of hiccups along the way, but have talk [sic] them through and quickly corrected them. I think that your biggest challenge going forward is building those relationships back up and maintaining. Continuing your cross training with the programmers, both you learning their world and them learning your world, will be a key activity in strengthening those relationships. I still get comments like "that's just Mike". This means that there is a level of tolerance that has built up on their side for how you carry yourself. They are willing to tolerate because they like the work you do. That is good, but should not be necessary. You are definitely heading in the right direction. Again, be aware of your audience and their reactions to you [sic] actions. This will help you continue to improve the way that you present yourself and carry yourself. Doc. 22-4 at 207.

As far as the work that you do. I'm very pleased with it. You have learned to keep your documents up to date and clean. You have increased the level of knowledge sharing between you and your peers. You have generated a library that will help everyone. You have encountered some challenges working with the skilled trades, not your fault. These challenges are completely driven by the current business climate that we are living in. Keep working in the right direction and take a look at some of the points that I have brought to your attention and I think we will have a successful FY16. Thank you for your effort to improve all of you [sic] skills. I know that it was not easy, but you have proven that you can do it. Thank you!!! *Id*.

2016 (based on anonymous feedback from peers): In summary: You have a lot of work let to do to on your people skills. Being able to have conversations that are acceptable to all in hearing distance, knowing when and where to talk about yours and others personal issues, and doing more than the minimum to get by is truly what respect for others means. Doc. 20-4 at 5.

2017: Successful performance rating. Doc. 22-4 at 213.

2018: Quite a bit of the issues that you have with co-workers comes from your attendance. It is difficult to achieve successful performance when you miss so much work. I know you are working on this, but you need to make sure you keep making progress. *Id*. at 215.

Prior to his discharge, Winters had never been disciplined for behavior, although he had been issued a warning for absenteeism. Doc. 22-4 at 3; Doc. 22-3 at 6-7. Winters won several awards for excellence during his employment, including awards in 2015, 2016 and 2017. Doc. 22-4 at 4. In 2016, Morrison indicated that Winters' "people skills" needed improvement. *Id.* at 210. Otherwise, Winters received successful ratings for his business and people skills from 2013 to 2018. *Id.* at 208-16.

## B.  *FMLA Leave*

In September 2016, Winters was approved for intermittent Family and Medical Leave Act (FMLA) leave to accommodate his anxiety and depression. Doc. 20-4 at 8. This allowed Winters to take one day off for every flare-up of his anxiety and depression, one to two times per month. *Id.* Winters also took FMLA leave from November 3, 2016, to mid-December, 2016, to accommodate what he described as a "mental breakdown." *Id.*; Doc. 20-3 at 49-50. Winters alleges this leave was necessary due to a mental breakdown caused, at least in part, by workplace harassment. Doc. 20-3 at 49. Specifically:

> Jared [Morrison] constantly was riding me, criticizing my work, telling me I'm not untouchable. There's been people of 30 years getting fired. PC. The way he treated me different than others.

*Id.* During this leave, Winters sought mental health treatment. *Id.*

In March 2018, Winters was approved for up to one day of FMLA leave per week to accommodate his anxiety. Doc. 20-4 at 8. From March 21, 2018, to November 8, 2018, Winters used FMLA leave on 21 different days. *Id.* He then took leave from November 9, 2018, through March 5, 2019, due to dizziness, light-headedness and blackouts. Doc. 22-4 at 4. During this leave, Winters exhausted his available FMLA leave and his salary continuation benefits. Doc. 20-4 at 8.

## C.  *May to October 2019*

Because of Winters' service time, he was allotted more than 30 days of vacation

per year, which restarted on May 1 of each year. Doc. 20-4 at 8. Further, as a salaried employee he could also miss work and receive full pay if the time used was not "excessive or abused." *Id.* From March 2019 to May 2019, Winters missed 12 days of work, using either sick time or vacation time. *Id.*; *see also* Doc. 22-3 at 5.

On May 6, 2019, Morrison denied Winters' request to take vacation. Doc. 22-3 at 5. In response, Winters filed a complaint with the Deere's Compliance Hotline, alleging Morrison had treated him differently since Winters returned from FMLA leave in March 2019, which Winters attributed to his age.[2] Doc. 20-5 at 26. Deere HR officials investigated the complaint but found the allegations unsubstantiated. *Id.* at 29. However, the investigation unearthed several complaints about Winters' performance. Winters' team members questioned his dependability and professionalism. *Id.* at 33-34; Doc. 20-6 at 1. His coworkers suggested he made inappropriate statements to others, including suppliers, and made others uncomfortable and used vulgarities. Doc. 20-5 at 33. Further, interviewees noted Winters' frequent absences. For instance, in both 2017 and 2018, Winters used approximately 75 percent of his vacation time within six months of his anniversary date. *Id.* Morrison also suggested Winters' performance was subpar, stating that if he had to rate Winters at the time, the rating would be "Performance Needs Improvement." *Id.* at 34.

On May 30, 2019, Winters requested the next day off but Morrison declined the request because he was already scheduled to be on vacation and needed Winters to provide coverage that day. Doc. 20-5 at 32-34. In response, Winters scheduled himself to be off of work "every Friday until winter" to make sure he was the first person to be scheduled for vacation on each of those days, even though he would not have the vacation

---

[2] The hotline complaint states Winters said Morrison began treating him differently upon return in April 2019 from his FMLA leave (Doc. 20-5 at 26), but it appears that Winters returned to work in March 2019. *See* Doc. 22-3 at 4 ("Beginning in November 2016 and concluding in March 2019, Deere provided Winters with Family and Medical Leave Act ('FMLA') and other medical leave, to accommodate Winters' depression and anxiety.").

time to support each request. *Id.*

Morrison kept HR representative Amanda Smith (now Amanda Holub) updated on Winters' absenteeism. Doc. 20-3 at 43-44. At some point, Smith suggested issuing Winters a warning for absenteeism. *Id.* at 44. On May 31, 2019, Smith emailed Morrison to advise him that she had received approval to issue the warning. Doc. 20-6 at 12.

On June 18, 2019, HR Representative Amy Green called Winters to inform him that the investigation of his May hotline complaint had concluded and Deere had found his allegations to be unsubstantiated. *Id.* at 9. The investigators recommended that HR work closely with Winters and Morrison, suggesting Morrison be clear in his expectations and feedback, although it is not clear whether anyone communicated the concerns about Winters' performance to him. Doc. 20-5 at 30.

On June 19, 2019, Winters met with Smith and Morrison, at which time he received the written warning about absenteeism. Doc. 20-3 at 36. In that warning letter, Smith wrote, "Your current level of attendance is not acceptable and there will be consequences should it continue. Failure to meet the above expectations, or perform successfully may result in further disciplinary action up to and including termination." Doc. 20-6 at 3. The letter also stated that if Winters needed to access FMLA leave, as he had in the past, he should contact the John Deere Disability and Leave Service Center. *Id.* During the meeting, Winters explained he struggled to get up in the morning because of his depression and anxiety. Doc. 22-4 at 5. Further, Winters alleges that he stated during this meeting that "I would feel like putting a gun to my head in the morning before work." *Id.* at 3, 5; *see also* Doc. 22-3 at 7.

Winters submitted a second complaint to the compliance hotline on June 22, 2019, this time alleging Morrison and Smith had retaliated against him by issuing the warning for absenteeism in response to his May 7, 2019, hotline complaint. Doc. 20-6 at 9. During the investigation, Morrison provided the May 31, 2019, email from Smith in which she wrote that she had received approval to issue a written warning to Winters for

9

his absenteeism. *Id*. Investigators also found that Morrison first learned of Winters'
initial hotline complaint during his June 3, 2019, interview for that complaint, which
occurred after the process to issue Winters a warning had begun. *Id*. at 10. Investigators
dismissed the second complaint on July 10, 2019. *Id*. at 11.

Winters and Morrison met for their monthly one-on-one session on July 10, 2019.
Doc. 22-3 at 7. Morrison alleges that it was around this time period, in July 2019, that
Winters first made any comment about putting a gun to his head. Doc. 22-4 at 73-74.
Morrison also alleges (and Winters denies) that Winters stated, "You don't know how
close I've come to ending it many times." Doc. 22-3 at 7. On July 11, 2019, Morrison
spoke with HR Manager Tabitha Leslie about Winters' self-harm comments. Doc. 20-6
at 71.

On July 12, 2019, Deere began a response to Winters' comments, eventually
scheduling a meeting between Winters and an Occupational Health Physician after delays
related to Winters' vacation. Doc. 22-3 at 7. Winters and Leslie met on July 25, 2019,
and Leslie informed Winters he would be placed on paid leave until he underwent a
review to determine his fitness for duty based on his self-harm comments. *Id*. at 8.
Winters returned to work on September 24, 2019, without any restrictions. *Id*.

Winters and Morrison met at Winters' request on Winters' first day back from
leave to discuss his work. *Id*. at 9; Doc. 20-6 at 39. Winters did not agree with the
feedback Morrison provided and was "hung up" on it, which prompted him to confront
a coworker he blamed for the critical feedback. Doc. 20-6 at 39; Doc. 22-3 at 9. The
coworker contacted Morrison after he was "chewed on . . . pretty good" by Winters.
Doc. 20-6 at 38.

In addition, when Winters learned about a team-building exercise that occurred
while he was on leave, and responded to the whole team, "It would have been nice if
someone notified me, I had no e-mail access!" *Id*. at 39; Doc. 22-3 at 9. Smith and
Leslie met with Winters to discuss his return to work and Winters took the next three
days off to regroup before again returning to work on Monday, September 30, 2019.

10

Doc. 20-6 at 39; Doc. 22-3 at 9-10.

### D.      October 7 and 8, 2019

On October 7, 2019, Winters and Morrison met again to discuss Winters' work. Doc. 22-3 at 10.  The next day, Winters requested a follow-up meeting with Morrison to "express my concern over his negativity and unusual criticism of my work." Doc. 22-4 at 6.  The conversation devolved quickly, as Winters "laid into" Morrison about the feedback Morrison had provided.  Doc. 22-4 at 126.  Winters raised his voice and stated, "I will fight you to the end on this.  And it will not turn out good . . . for one of us." Doc. 22-3 at 10.  According to Morrison, this was the first time Winters had ever yelled at him.  Doc. 22-4 at 79.  Morrison took this statement as a threat, although he did not know what kind of threat it was.  *Id.* at 81-82.  After the meeting, both Winters and Morrison contacted HR.  Doc. 22-3 at 11.

Later that morning, Leslie sent an email to her supervisor, Michelle Luebke, noting there was an employee situation that she and Smith wanted to discuss.  Doc. 20-5 at 5.  Luebke's notes from the meeting suggest she or others found that Winters' behavior was inappropriate, but likely did not rise to the level of workplace violence.  Doc. 22-4 at 261.  She also noted that Morrison was concerned about Winters' outbursts and about the fact that Winters knew where he lived.  *Id.*

Luebke's notes only briefly mention Winters' work performance.  *Id.*  Morrison had suggested Winters would receive a performance needs improvement (PNI) rating in his annual review, which is the second lowest rating.  Doc. 22-4 at 151, 261.  However, Morrison had not made a final decision on Winters' performance rating and he had not provided an official rating to Winters, as Morrison was "afraid" to do so, "given the threats that Michael has given him." *Id.* at 151-52.

In the meeting between Luebke, Leslie and Smith, they did not discuss Winters' performance reviews.  *Id.* at 109.  However, Luebke testified "there was a conversation about the most recent issue something related to – something related to design and the

11

quality or lack of quality thereof." *Id*. at 144-45. Winters was not otherwise under any investigation regarding his performance at this time. *Id*. at 130.

During the meeting with Luebke and Smith, Leslie recommended that Winters' employment be terminated. Luebke agreed. *Id*. at 140-41. Later that day, Smith emailed Leslie, outlining the reasons for termination, which included:

> Provide people with a safe work environment. Continually get way with conduct that is abusive to others. Not take constructive feedback and accept it. Whether you agree or disagree way [sic].
>
> Given him every opportunity to be successful.
>
> Provided him FMLA and time off needed to take care of himself. Came back with no other accommodations.

Doc. 20-6 at 43. In the action items section of the email, Smith noted, "Less you say, the better: His behavior is not acceptable. Cannot tolerate it and will not tolerate it and am separating him." *Id*.

When Winters arrived at work the next morning, he was met by Eric Knight, John Deere's security manager, who escorted him to a conference room. Doc. 22-3 at 12. Leslie then informed Winters via telephone that his employment was being terminated. Doc. 22-3 at 12. This was the first time Leslie had discharged an employee by phone, with security present. Doc. 22-4 at 113-14. In the "Termination Talk sheet" Leslie used, she wrote: "We are meeting today to advise you that the Company has made the decision to separate your employment. This is an outcome of your behavior you have demonstrated since you returned. The behavior is not acceptable and will not be tolerated." Doc. 20-5 at 2-3.

Winters did not react with any threats or violence during the discussion. Doc. 22-4 at 183. After the meeting, Knight reached out to the Buchanan County Sheriff's office to suggest they contact Winters to "assure he knows the consequences" of contacting Morrison. *Id*. at 240. A police officer contacted Winters, who assured him he would stay away from Morrison and his residence. *Id*. at 242.

12

Luebke described performance as the "primary issue" for Winters' termination. *Id*. at 144. She testified:

> I think the main issue was the performance and the manager trying to give him feedback about some concern about his work product, and he didn't take the feedback at all very well. So, at the end of the day, the manager wants to get the work done in a quality way and the work wasn't getting done in a quality way.

Id. at 138.

## V.    ANALYSIS

Under the ICRA:

> It shall be an unfair or discriminatory practice for any:

> Person to refuse to hire, accept, register, classify, or refer for employment, to discharge any employee, or to otherwise discriminate in employment against any applicant for employment or any employee because of the age . . . or disability of such applicant or employee."

Iowa Code § 216.6(1)(a). As noted above, Winters asserts the following ICRA claims: (1) age discrimination, (2) harassment, (3) retaliation, (4) failure to accommodate and (5) disability discrimination. *See* Doc. 4.

Deere seeks summary judgment on all of these claims. Doc. 20 at 2. In his resistance, Winters asserts that the motion should be denied but provides no arguments concerning his age discrimination, harassment or retaliation claims. *See* Docs. 22, 22-1. "[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument." *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009). In light of Winters' failure to present any arguments concerning his age discrimination claim, I find that he has abandoned his age discrimination, harassment or retaliation claims and therefore will grant Deere's motion for summary judgment as to those claims.

Winters' remaining claims are failure to accommodate and disability discrimination. While these claims are brought under the ICRA, not the Americans with

13

Disabilities Act (ADA), when the parties "do not dispute the application of federal analysis, disability claims under the ICRA are generally analyzed in accord with the ADA." *Gretillat v. Care Initiatives*, 481 F.3d 649, 652 (8th Cir. 2007) (citing *McElroy v. State*, 703 N.W.2d 385, 391 (Iowa 2005)); *see also Kallail v. Alliant Energy Corporate Services, Inc.*, 691 F.3d 925, 930 (8th Cir. 2012) ("'[D]isability claims under the ICRA are generally analyzed in accord with the ADA.'" (quoting *Gretillat*, 481 F.3d at 652)). Because the parties do not argue otherwise, I will analyze Winters' ICRA disability claims under the federal framework. There is no dispute, for summary judgment purposes, that Winters' conditions of anxiety and depression qualify him as disabled under the ICRA.

## A. *Failing to Afford a Reasonable Accommodation*

Under the ADA, prohibited discrimination includes:

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity....

42 U.S.C. § 12112(b)(5)(A); *see also Battle v. United Parcel Service, Inc.*, 438 F.3d 856, 862 (8th Cir. 2006) (citing 42 U.S.C. § 12112(b)(5)(A)). In a failure to accommodate case, "the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty-the failure to reasonably accommodate the disabled individual's limitations." *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004). The Eighth Circuit Court of Appeals has explained:

> it is not the employer's discriminatory intent in taking adverse employment action against a disabled individual that matters. Rather, discrimination occurs when the employer fails to abide by a legally imposed duty. The known disability triggers the duty to reasonably accommodate and, if the employer fails to fulfill that duty, we do not care if he was motivated by the disability.

*Id.* (citations omitted).

14

Thus, "an employer is required to provide reasonable accommodations to the known physical or mental limitations of an otherwise qualified employee with a disability, unless the requisite accommodation would impose an undue hardship on the employer's business." *Battle v. United Parcel Service, Inc.*, 438 F.3d 856, 862 (8th Cir. 2006) (citing 42 U.S.C. § 12112(b)(5)(A)). Only when an employer is made aware of the legitimate need for an accommodation must it "make a reasonable effort to determine the appropriate accommodation." *E.E.O.C. v. Convergys Customer Mgmt. Group*, 491 F.3d 790, 795 (8th Cir. 2007) (internal citation and quotation omitted). An employer cannot be liable for failure to accommodate when an employee makes no request for an accommodation. *Walz v. Ameriprise Financial, Inc.*, 779 F.3d 842, 847 (8th Cir. 2015) (citing *Ballard v. Rubin*, 284 F.3d 957, 964 (8th Cir. 2002).

In general, individuals with disabilities have the responsibility to request the accommodation from their employers. *Wallin v. Minnesota Dept. of Corrections*, 153 F.3d 681, 689 (8th Cir. 1998). Not only must the employee request the accommodation, he or she must inform the employer the accommodation is connected to a disability. *Id.*

> Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, as is often the case when mental disabilities are involved, the initial burden rests primarily upon the employee … to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations.

*Wallin*, 153 F.3d at 689 (quoting *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996). However, an employee need not use the "magic word 'accommodation.'" *Evans v. Cooperative Response Center Inc.*, 996 F.3d 539, 587 (8th Cir. 2021). "The test is whether [the plaintiff made her employer] 'aware of the need for an accommodation.'" *Garrison v. Dolgencorp, LLC*, 939 F.3d 937, 941 (8th Cir. 2019) (quoting *EEOC v. Convergys Customer Mgmt. Grp., Inc.*, 491 F.3d 790, 795 (8th Cir. 2007)).

When the alleged disability involves mental illness, it is not sufficient that the employer simply knows about the mental illness, as employees must specify what type of

15

accommodation they seek. *See Walz*, 779 F.3d at 845-46 (even if a note from the plaintiff's doctor put the company on notice that she suffered from a mental illness, it did not specify her limitations resulting from her mental illness, and she subsequently could not show she was qualified to perform the essential functions of her job without an accommodation); *Mole v. Buckhorn Rubber Products, Inc.*, 165 F.3d 1212, 1217-18 (8th Cir. 1999) (even though the employer had previously provided every accommodation the plaintiff requested, only the plaintiff can accurately identify the need for an accommodation and the employer was not liable for failing to actively determine whether the plaintiff needed further accommodations after she returned to work and told her employer she was "feeling fine"). Employees cannot expect employers to read their minds and know they need an accommodation. *Evans*, 996 F.3d at 547. Further, accommodations are meant to be prospective. *Hill v. Kansas City Area Transp. Auth.*, 181 F.3d 891, 894 (8th Cir. 1999). Therefore, requests for accommodations after terminable conduct occurs are untimely. *Schaffhauser v. United Parcel Service, Inc.*, 794 F.3d 899, 906 (8th Cir. 2015).

"Where the employee requests accommodation, the employer must engage in an 'informal, interactive process' with the employee to identify the limitations caused by the disability and the potential reasonable accommodations to overcome those limitations." *Battle*, 438 F.3d at 862 (citing *Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 951 (8th Cir. 1999)). At the summary judgment stage, "the failure of an employer to engage in an interactive process to determine whether reasonable accommodations are possible is prima facie evidence that the employer may be acting in bad faith." *Cravens v. Blue Cross and Blue Shield of Kansas City*, 214 F.3d 1011, 1021 (8th Cir. 2000) (quotation omitted). If a court concludes that the employer failed to engage in the interactive process, then "a factual question exists as to whether the employer has attempted to provide reasonable accommodation as required by the ADA." *Cravens*, 214 F.3d at 1021 (quoting *Fjellestad*, 188 F.3d at 952). But, "if no reasonable

16

accommodation is available, an employer is not liable for failing to engage in a good-faith interactive process." *Battle*, 438 F.3d at 864 (citation omitted).[3]

Deere argues it cannot be liable for failing to accommodate Winters because he never requested an accommodation for his anxiety and depression. Further, Deere argues that even if Winters had requested an accommodation, there was no reasonable accommodation available, exempting Deere from engaging in an interactive process with Winters. In response, Winters argues that summary judgment is inappropriate because, at the very least, a factual question exists as to whether Deere attempted to accommodate Winters, as it did not engage in an interactive process to identify a reasonable accommodation and Winters has suggested two accommodations he claims are reasonable.

Winters admits he did not explicitly request an accommodation, but instead argues that Deere was "well-aware" of Winters' disability, and that Deere employees had previously been involved in "calming Mike down" after previous interactions with other Deere employees. Doc. 22-1 at 12. Because Deere was "well-aware" of Winters'

---

[3] Failure-to-accommodate claims follow a modified burden-shifting analysis. *Fenney v. Dakota, Minnesota & Eastern Railroad Co.*, 327 F.3d 707, 712 (8th Cir. 2003). Under that analysis:

> [T]he employee "must first make a facial showing that he has an ADA disability and that he has suffered an adverse employment action. Then he must make a facial showing that he is a 'qualified individual.'" "To be a 'qualified individual' within the meaning of the ADA, an employee must '(1) possess the requisite skill, education, experience, and training for his position, and (2) be able to perform the essential job functions, with or without reasonable accommodation.'" In cases where the employee claims that he is able to perform the essential functions of the job with reasonable accommodation, the employee "must only make a 'facial showing that a reasonable accommodation is possible.'" When the employee has made that facial showing "the burden then shifts to the employer to show that it is unable to accommodate the employee."

*Brannon v. Luco Mop Co.*, 521 F.3d 843, 848 (8th Cir. 2008) (quotations and citations omitted). Here, neither party meaningfully addresses the elements or burdens within the modified burden-shifting framework. While this analysis is relevant, it is not dispositive in this case. Therefore, I do not address it here.

17

disability, Winters alleges that Deere's failure to "calm him down" after his argument with Morrison on October 8, 2019, or to have an HR representative sit in on meetings between Morrison and Winters, violated Deere's duty to reasonably accommodate Winters' anxiety and depression.[4]  Doc. 22-1 at 12.

It is undisputed that Deere encouraged Winters to request accommodations as needed.  Deere supplemented Winters' November 2018 to March 2019 FMLA leave with additional time off, as his FMLA expired before medical professionals cleared him to return to work.  Doc. 22-3 at 4.  In the written absenteeism warning Deere provided to Winters in June 2019, Deere wrote:

> We, your manager and Human Resources, understand that you have had approved FMLA leave in the past. Should you need to sign up for this service again, please call the John Deere Disability and Leave Service Center at 1-855-232-0815. We have also discussed the Live Well Work Well resources that are available to you, and we encourage you to utilize them as appropriate.

Doc. 20-6 at 3.  After Deere mandated that Winters take leave while a doctor determined whether he was fit for duty, Winters returned to work in September 2019 with no restrictions and he did not request any accommodations.  Doc. 22-3 at 8-9.  That same day, he requested an additional three days of leave, which Deere provided.  Doc. 22-3 at 9.  While Deere was aware of Winters' disability, he did not notify Deere of a need to accommodate his anxiety and depression.   Nor did he ask HR officials to sit in on meetings between him and Morrison, or request that Deere have other employees "calm him down" after his emotional outbursts.  Based on the record before me, there is no

---

[4] Because accommodations are meant to be prospective, Winters must argue that his emotional interactions with Deere employees that took place prior to October 8, 2019, sufficed to put Deere on notice that Winters required an accommodation.  *See Hill*, 181 F.3d at 894.  While Winters does argue that Deere employees had been involved in "calming Mike down" before (Doc. 22-1. at 12), he also argues this was the first and only time he raised his voice at Morrison.  Doc. 22-1 at 7.  Winters' attempt to distinguish his previous emotional interactions with co-workers from what transpired with Morrison on October 8, 2019, undermines his claim that Deere was on notice that he required an accommodation.

18

genuine issue of material fact as to whether Deere failed to accommodate Winters, as Winters did not request an accommodation. Deere is entitled to summary judgment on this claim.

Even if Winters had requested an accommodation, "if no reasonable accommodation is available, an employer is not liable for failing to engage in a good-faith interactive process." *Battle*, 438 F.3d at 864 (citation omitted). The ADA provides that potential accommodations include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). As noted above, Winters contends that Deere should have "calmed him down" after his October 8, 2019, argument with Morrison, as other employees had done previously. Doc. 22-1 at 12. He also argues that Deere could have had an HR person sit in on meetings between Winters and Morrison. Doc. 22-1 at 12-13.

With regard to having an HR employee sit in on meetings, Winters alleges only that such an accommodation would have helped to improve communication between Winters and Morrison, but does not explain how any alleged miscommunications were related to his disability. Further, even if miscommunications between Winters and Morrison were somehow related to Winters' disabilities, Winters admits that he regularly engaged in difficult conversations with other Deere employees while remaining calm. Doc. 22-1 at 13-15. Winters has not shown that having an HR person involved in every meeting between himself and Morrison would have constituted a reasonable accommodation of Winters' disability, even if Winters would have actually requested it.

Similarly, Winters' suggestion that Deere should have accommodated his disability by having employees "calm him down" is not only vague and practically unworkable, but also unlike any of the accommodations described in the ADA. Suggested accommodations that would require employers to tolerate disruptive behavior, regardless

19

of whether that behavior is disability-induced, are manifestly unreasonable. *See, e.g., McElwee v. County of Orange*, 700 F.3d 635, 645-46 (2d Cir. 2012) ("Requiring others to tolerate misconduct, however, is not the kind of accommodation contemplated by the ADA"); *Green v. Medco Health Solutions of Texas, L.L.C.*, 560 Fed. Appx. 398, 402 (5th Cir. 2014) (an accommodation requiring an employer to ignore past violations of an attendance policy is not reasonable under the ADA). Guidance from the Equal Employment Opportunity Commission supports this proposition. *See* Section V(B), *infra* (explaining that misconduct, even when caused by a disability, can be grounds for discipline).

Winters did not request the accommodations he now proposes and, even if he had, they are not reasonable accommodations of his disabilities. Deere is entitled to summary judgment on the failure-to-accommodate claim.

## B.     *Disability Discrimination*

The ADA prohibits discrimination against a "'qualified individual with a disability' because of the disability." *Scruggs v. Pulaski Cnty.*, Ark., 817 F.3d 1087, 1092 (8th Cir. 2016) (quoting *Bahl v. Cnty. of Ramsey*, 695 F.3d 778, 783 (8th Cir. 2012) (internal quotation marks omitted). Discrimination may be proven through direct or indirect evidence. *Lipp v. Cargill Meat Sols. Corp.*, 911 F.3d 537, 543 (8th Cir. 2018). Direct evidence "shows a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *St. Martin v. City of St. Paul*, 680 F.3d 1027, 1033 (8th Cir. 2012) (citing *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004) (internal quotation marks omitted). "Direct evidence includes evidence of conduct or statements by persons involved in the decision[-]making process that may be viewed as directly reflecting the alleged discriminatory attitude where it is sufficient to support an inference that discriminatory attitude more likely than not was a motivating factor." *Schierhoff v. GlaxoSmithKline*

20

*Consumer Healthcare, L.P.*, 444 F.3d 961, 966 (8th Cir. 2006) (internal citations and quotation marks omitted). However, stray remarks, statements unrelated to the decisional process and statements by non-decisionmakers are not direct evidence of discrimination. *Id.* "A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether his strong evidence is circumstantial." *Griffith*, 387 F.3d at 736.

Without direct evidence of a discriminatory motive, courts analyze discrimination claims under the burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, the plaintiff has the initial burden to establish a prima facie case of discrimination. *Id.* at 1043. This requires a "minimal evidentiary showing" that he or she (1) is a member of a protected class, (2) was qualified for the position or met his or her employer's legitimate expectations, (3) suffered an adverse employment action and (4) the circumstances of his or her adverse employment action, give rise to an inference of discrimination. *Banks v. Deere*, 829 F.3d 661, 666 (8th Cir. 2016); *Young*, 754 F.3d at 577; *see also Mahn v. Jefferson Cty.*, Mo., 891 F.3d 1093, 1096 (8th Cir. 2018) (noting the "minimal evidentiary showing" requirement).

Establishing a prima facie case creates a presumption that the employer discriminated against the plaintiff. *Banks*, 829 F.3d at 666. The burden then shifts to the defendant to present evidence of a legitimate, non-discriminatory reason for the adverse action. *Id.* If the defendant provides such a reason, the burden shifts back to the plaintiff to show the proffered reason is pretext for discrimination. *Evans v. Cooperative Response Center, Inc.*, 996 F.3d 539, 545 (8th Cir. 2021).

### 1.     *Direct Evidence*

Winters alleges direct evidence shows Deere fired him based on "its own misperception of [Winters'] mental illness." Doc. 22-1 at 7-8. As direct evidence, Winters points to the following:

- Deere employees feared Winters might "snap,"

- the company "overreacted" to an "off-hand comment" about Winters' suicidal ideation,

- Morrison was concerned over how Winters would react to a negative performance review,

- Deere discharged Winters via telephone, though that was atypical,

- a Deere security officer called local law enforcement to pay a visit to Winters after his discharge, and

- Morrison claimed that Winters and his wife drove past Morrison's home the day Deere discharged Winters.

Doc. 22-1. Deere argues that Morrison's concerns cannot constitute direct evidence because Morrison did not make the decision to discharge Winters. Doc. 24 at 3-4. Instead, according to Deere, the decision was made by HR employees Leslie, Smith, and Luebke, with Luebke ultimately approving Leslie's recommendation to do so. Doc. 20-2 at 8-9. While Leslie, Smith, and Luebke took Morrison's thoughts into consideration, there is no evidence that Morrison was the decisionmaker. As such, his thoughts, beliefs or statements are not direct evidence of discrimination. *See Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 966 (8th Cir. 2006).

Smith did take part in Deere's response to Winters' admitted suicidal ideation, while Leslie advised Winters of his discharge by telephone and arranged for a security officer to contact local police. However, none of these facts show a specific link between Deere's alleged discriminatory animus and the termination of Winters' employment. As such, Winters' evidence is more appropriately categorized as indirect evidence, subjecting Winters to the burden-shifting analysis required by *McDonnell Douglas*.

22

## 2. *Indirect Evidence*

While Deere denies that Winters is able to make a prima facie showing of discrimination, it focuses its arguments on the remaining steps of the *McDonnell Douglas* framework (legitimate non-discriminatory reason and pretext). Doc. 20-1 at 9-11. For purposes of analyzing Winters' disability discrimination claim, I will assume that he can establish a prima facie case.

Deere argues it has provided evidence of a legitimate, non-discriminatory reason for Winters' discharge. It argues that it terminated Winters' employment because of "a culmination of events with the last straw being Winters' conduct on October 8, 2019, and a lack of remorse for it: namely, Winters' inability to receive feedback without threats or raising his voice with colleagues and his supervisor, and to continue working without taking time off." Doc. 20-1 at 8. Deere also contends that the termination decision was based on "Winters' . . . longstanding difficulty getting along with co-workers, lack of remorse for his outburst toward Morrison indicating this pattern of behavior would continue, stating that the situation 'would not turn out good for one of us,' and Winters' overall history of performance and attendance issues." Doc. 20-1 at 11.

Misconduct, regardless of whether it is caused by a disability, is a legitimate, non-discriminatory reason for adverse employment action. For example, the EEOC provides the following hypothetical Q&A:

> If an employee's disability causes violation of a conduct rule, may the employer discipline the individual?
>
> Yes, if the conduct rule is job-related and consistent with business necessity and other employees are held to the same standard. The ADA does not protect employees from the consequences of violating conduct requirements even where the conduct is caused by the disability.
>
> The ADA generally gives employers wide latitude to develop and enforce conduct rules. The only requirement imposed by the ADA is that a conduct rule be job-related and consistent with business necessity when it is applied to an employee whose disability caused her to violate the rule. Certain conduct standards that exist in all workplaces and cover all types of jobs will always meet this standard, such as prohibitions on violence, threats of

23

violence, stealing, or destruction of property. Similarly, employers may prohibit insubordination towards supervisors and managers and also require that employees show respect for, and deal appropriately with, clients and customers.

EEOC, Applying Performance and Conduct Standards to Employees with Disabilities § III(B)(9) (Jan. 20, 2011), http://www.eeoc.gov/facts/performance-conduct.html# conduct (citation omitted). This position is consistent with Eighth Circuit cases holding employees with disabilities to the same conduct standards as their counterparts. *See Harris v. Polk County, Iowa*, 103 F.3d 696, 697 (8th Cir. 1996) ("We agree with the courts of appeal that recognize an employer may hold disabled employees to the same standard of law-abiding conduct as all other employees."); *see also Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006) ("We have consistently held that violating a company policy is a legitimate, non-discriminatory rationale for terminating an employee."). Thus, Deere has provided legitimate, non-discriminatory reasons for discharge.

Of course, this leads to the issue of whether Deere's explanations are pretextual. To show pretext, a plaintiff "must present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false and that discrimination was the real reason." *Lindeman v. Saint Luke's Hospital of Kansas City*, 899 F.3d 603, 606 (8th Cir. 2018) (quoting *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 768 (8th Cir. 2008)) (internal quotation marks omitted). A plaintiff may show pretext by showing that an employer failed to follow its own policies. *Lake v. Yellow Trans., Inc.*, 596 F.3d 871, 874-75 (8th Cir. 2010) (internal citations omitted). A plaintiff may also show pretext by showing the reason for the adverse employment action has no basis in fact. *E.E.O.C. v. WalMart Stores*, 477 F.3d 561, 570 (8th Cir. 2007).

Winters makes two arguments to demonstrate pretext. First, he alleges Deere failed to follow its own policies in its response to his behavior. Doc. 22-1 at 7. For instance, Winters points to admissions by Deere's HR representatives that there was no policy requiring the company to terminate employees who argue with their supervisors.

24

*Id.* at 11. Further, Winters contends that the compliance department typically investigated complaints about employee behavior before determining whether there should be discipline. *Id.* He states there was no investigation into the merits of his argument with Morrison. *Id.* He thus classifies Deere's decision to terminate his employment as "rushed" and contrary to company policy. *Id.*

Leslie testified that Deere's policy on insubordination did not require the company to discharge an employee for arguing with his or her supervisor.[5] Doc. 20-3 at 19. Instead, instances of insubordination could be taken into account when considering what discipline is appropriate. *Id.* However, there is no evidence that Deere had any policy *against* discharging an employee for insubordination. Thus, the decision to discharge Winters based on his conduct was neither compelled nor prohibited by company policy.

"An employer can certainly choose how to run its business, including not to follow its own personnel policies regarding termination of an employee … as long as it does not unlawfully discriminate in doing so." *Schaffhauser*, 794 F.3d at 904 (quoting *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 863 (8th Cir. 2009)). Winters has provided no evidence to support a finding that Deere actually violated its own personnel policies in deciding to discharge him. Even if a violation arguably occurred, Winters would still have to establish that Deere acted with a discriminatory motive. A plaintiff "must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination." *Wilking v. County of Ramsey*, 153 F.3d 869, 874 (8th Cir. 1998) (quoting *Mathews v. Trilogy Communications, Inc.*, 143 F.3d 1160, 1165 (8th Cir. 1998)).

Winters contends that his disability was more likely the motivating factor for his termination. Doc. 22-1 at 10 (citing *Dalton v. Manor Care of Des Moines IA, LLC*, No 4:12-CV-00175-JEG, 2013 WL 11311236, at *18 (S.D. Iowa Nov. 13, 2013)). He points to his work history, which is devoid of discipline or threats against his coworkers.

---

[5] Neither party submitted a copy of a written policy on this issue.

Doc. 22-1 at 11. Because he was calm during the meeting in which he was advised of his discharge, and his medical records show that his mental health was stable in October 2019, Winters argues "[t]he most likely reason for Mike Winters's termination is Deere's exaggerated perception of Mike's mental illness." *Id.*

Deere repeatedly accommodated Winters' depression and anxiety, which it first learned of some three years before his discharge. Winters' arguments rely heavily on his belief that his disagreements with his supervisor did not warrant termination. However, his suggestion "'that the infractions were not serious enough to warrant a discharge … merely questions the soundness of defendant's judgment,' and does not demonstrate pretext for discrimination." *Wilking*, 153 F.3d at 874 (citing *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 945 (8th Cir. 1994)); *see also Clay v. Hyatt Regency Hotel*, 724 F.2d 721, 725 (8th Cir. 1984) ("While an employer's judgment may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was pretext for illegal discrimination.").

Deere's reasons for terminating Winters' employment were legitimate and non-discriminatory. Reasonable jurors could not infer that Deere discriminated against him due to his disability. As such, Deere is entitled to summary judgment on Winters' disability discrimination claim.

## VI. CONCLUSION

For the reasons set forth herein, defendant Deere & Company's motion for summary judgment (Doc. 20) is **granted** as to all claims.

Because this order disposes of all claims, judgment **shall enter** in favor of the defendant. The jury trial scheduled to begin January 10, 2022, is **cancelled**.

**IT IS SO ORDERED.**

**DATED** this 7th day of December, 2021.

 

_____

Leonard T. Strand, Chief Judge